[Cite as *In re J.B.*, 2023-Ohio-930.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE J.B., ET AL.          :

         :          No. 111797

Minor Children          :

         :

[Appeal by A.B.-B., Mother]          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 23, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-18914313 and AD-18914314

---

### *Appearances:*

Judith M. Kowalski, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

LISA B. FORBES, J.:

{¶ 1} A.B.-B. ("Mother") appeals the juvenile court's decision terminating her parental rights and awarding permanent custody of her twins J.B. and N.B. (d.o.b. 2/2/2013) (collectively "the children"), to the Cuyahoga County Division of Children and Family Services ("CCDCFS"). Mother argues that (1) "the trial court abused its discretion in awarding permanent custody, because the state did not

present sufficient, clear and convincing evidence necessary to justify termination of parental rights," and (2) the "court erred and abused its discretion by not granting the request by Mother's counsel for a continuance." After reviewing the facts of the case and pertinent law, we affirm the juvenile court's judgment.

## I.  Procedural History

{¶ 2}  On November 20, 2018, CCDCFS filed a complaint in juvenile court alleging that J.B. and N.B.[1] were abused, neglected, and dependent and requested predispositional temporary custody of the children to CCDCFS. Specifically, the complaint alleged that "Mother has engaged in excessive and inappropriate discipline of the children. On * * * November 19, 2018, mother struck J.B. on the left side of his face, which resulted in swelling. Mother did not seek medical attention for the child." The complaint also alleged that Mother lacked stable housing, had a history of homelessness, and had "a mental health diagnosis, specifically depression, which prevents her from providing appropriate care for the children."

{¶ 3}  On December 18, 2018, CCDCFS filed a case plan for Mother. Her objectives included taking parenting classes, obtaining stable housing, and completing a mental-health evaluation, as well as treatment if needed.

---

[1] The complaint also concerned two other children of Mother, who were ultimately placed in the custody of their father, who is not the father of J.B. and N.B. These two other children are not a part of the instant appeal. Additionally, J.B. and N.B.'s father is not a part of the instant appeal.

{¶ 4} On March 4, 2019, Mother stipulated to an amended complaint, the court adjudicated J.B. and N.B. abused, neglected, and dependent, and the court granted temporary custody of the children to CCDCFS. The court extended temporary custody in November 2019.

{¶ 5} In July 2020, Mother's case plan was amended because she had made "substantial progress with case plan objectives." Specifically, Mother completed parenting classes and a mental-health evaluation, which "noted no concerns with substance abuse at this time." Additionally, Mother had "maintained stable housing since July of 2019." The amended case plan also found that J.B. and N.B. were "exhibiting emotional/behavioral outbursts in school" and in their foster home and recommended "special education services to address their cognitive and developmental delays."

{¶ 6} On October 5, 2020, CCDCFS filed another amended case plan for Mother, which included the following change: "Mother has been compliant with case plan services. Mother to begin weekend unsupervised overnight visits, as well as continue weekly unsupervised visits."

{¶ 7} On October 6, 2020, the court extended temporary custody a second time, finding that "[t]here has * * * not been significant progress on the case plan by the mother * * * and progress has not been made in alleviating the cause for the removal of the child[ren] from the home." The court also found that returning J.B. and N.B. to Mother's home "will be contrary to the child[ren]'s best interest and welfare."

{¶ 8} On October 7, 2020, CCDCFS filed a motion to terminate temporary custody and return J.B. and N.B. to Mother's care. CCDCFS stated in the motion that

> it is in the best interests of the children to be returned home to the mother because she has successfully completed the case plan and has remedied the risks that initially caused the child[ren] to be removed. Specifically, she has completed parenting education and a psychological evaluation. Mother is engaging in ongoing therapy. She has stable housing and employment and is able to meet the basic needs of the children. Additionally, the mother has been having unsupervised visits with the children and all of the visits have gone well.

{¶ 9} On November 3, 2020, CCDCFS filed another amended case plan "suspend[ing] overnight/unsupervised visitation with mother, due to current allegation and investigation." A semiannual review ("SAR") dated October 28, 2020, explained the following:

> There were recent allegations of drug use in mother's home by mother and boyfriend. * * * During the first overnight visit it's reported the children had access to marijuana in the home. The agency has requested mother complete a hair sample drug screen but it has not happened yet. The overnight visits have been suspended pending the hair screen results. Mother has been testing negatively through urine screens since June. There are also concerns for mother's live in boyfriend being controlling, negative, and threatening the children. The agency currently has a pending motion for reunification and currently ha[s] a second extension of [temporary custody]. Due to time frames, active safety concerns, and lack of compliance, the agency is moving forward with a motion [for permanent custody] for [the] children.

{¶ 10} Another SAR was conducted on April 29, 2021, and filed in court on May 12, 2021. The SAR reported that Mother completed a urine drug screen on October 15, 2020, which was negative, and a hair follicle drug screen on

November 18, 2020. As a result, the aforementioned allegations were unsubstantiated on November 24, 2020.

{¶ 11} On May 26, 2021, the court held a hearing on CCDCFS's motion to terminate temporary custody. On June 15, 2021, the court ordered that Mother, her boyfriend, and any other adult living in Mother's household complete a hair follicle drug test and background check. The court continued the hearing on CCDCFS's motion.

{¶ 12} On September 2, 2021, CCDCFS filed a "motion to amend dispositional prayer from 'terminate temporary custody * * *' to permanent custody to CCDCFS." This motion alleged that Mother failed to comply with the hair follicle drug test ordered on June 15, 2021, and "failed to communicate with CCDCFS or the children since May 26, 2021, a period of longer than [90] days." Several hearings on this motion were scheduled and continued. According to the record, Mother received notice of these hearings.

{¶ 13} The hearing on CCDCFS's motion for permanent custody took place on June 14, 2022. Mother did not appear. Mother's counsel requested a continuance, which the court denied. On June 15, 2022, the court issued a journal entry awarding permanent custody of J.B. and N.B. to CCDCFS. It is from this order that Mother appeals.

## II. Hearing Testimony

{¶ 14} At the beginning of the hearing on CCDCFS's motion for permanent custody, Mother's counsel requested a continuance, stating that Mother "is not here.

She has not been arraigned and we have been playing phone tag for the last five months." The court responded as follows: "This is time number 18 with respect to this case or these cases, so the request to reset it, continue it because mom failed to appear when notified * * *, I'm not going to continue it, so we're gonna go forward."

{¶ 15} Prior to testimony regarding J.B. and N.B., the CCDCFS attorney made the following statement to the court:

The Agency is seeking permanent custody under 2151.414(B)(1)(d).

These children have been in Agency custody since I think November of 2018.

The father has not made any effort to have any relationship with them.

The mother has not had any meaningful relationship with them in the last — since approximately May of last year, so at this time the Agency believes that permanent custody is in the best interest of [J.B.] and [N.B.]

{¶ 16} The attorney appointed to represent J.B. and N.B. stated the following:

Your Honor, [the children] have voiced that they would like to live with their mother, so I ask that once you hear the testimony, you take that into consideration.

The children do have a right to state where they'd like to be, and they've made it known that they want to be with their mother.

{¶ 17} Olivia Grucza, who is an ongoing social service worker for CCDCFS, testified that J.B. and N.B. were removed from Mother's custody in November 2018, because J.B. "came to school with a knot, an egg on his forehead. * * * [Like] a goose egg from him being hit on the top of the head." Grucza further testified that J.B. and

N.B. have not been in the custody of anyone other than CCDCFS since November 2018.

{¶ 18} According to Grucza, Mother initially completed all of her case plan objectives. Mother's case plan included stable housing, which she obtained in July 2019; parenting classes, which she completed in July 2019; mental-health counseling, which she completed in the beginning of 2021; a psychiatric evaluation, which she completed in August 2020; and an alcohol and drug assessment, which she completed in 2020, although "[t]here was no recommendation from that assessment * * *."

{¶ 19} Grucza testified that CCDCFS attempted overnight visits with Mother for J.B. and N.B. An "extended visit" occurred at one point, but in May 2021, "[The Magistrate] ordered that the boys go back into foster care so mom can do some additional services. Once those orders were put in place, mom no longer wanted to have communication with" CCDCFS.

{¶ 20} Grucza testified as follows about the additional services ordered: "A drug screen, urine and hair follicle drug screen, and that any member 18 or over living in her home to do background checks and urine and hair drug screens." Grucza "sent multiple purchase orders" for these drug screens for Mother and Mother's boyfriend. Grucza sent Mother text messages and emails, as well as called Mother and left voicemails, regarding these tests. Asked if Mother ever responded, Grucza replied, "Few and far between." Grucza further testified that Mother has never requested assistance with these tests.

{¶ 21} According to Grucza, J.B. and N.B. would call Mother sometimes. "I think they talked to her five times over the phone since * * * May of 2021." Mother has never initiated a call to J.B. and N.B, although she "will call them back if she misses their call * * *."

{¶ 22} Grucza testified that she had no knowledge of Mother's current housing situation. She has unsuccessfully attempted to visit Mother's home. "Any time I send her email or text messages, I ask can I come see basic needs, can I see your home? Usually the response is no, we don't want the Agency here or I need to pay for what I've done to her family." Grucza further testified that she has been unable "to assess Mother's ability to provide for the children's basic needs."

{¶ 23} According to Grucza, J.B. and N.B. are "doing well" in their foster home. "Behaviors have decreased, they're no longer wetting the bed, they've done well in school. They participate in a[n] after-school program." Both children are on "IEPs." "One is for speech and language, and the other one I think is not specific. I think it's for behaviors." According to Grucza, there are no relatives who have been approved to take custody of J.B. and N.B.

{¶ 24} Grucza concluded that permanent custody to CCDCFS is in the best interest of J.B. and N.B. "[d]ue to the fact that mother is not visiting. They want to be with mom, but the bond is obviously strained now. I can't assess any basic needs or safety in her home and we have no information on the boyfriend that lives in her home."

{¶ 25} Wildon Ellison, the guardian ad litem ("GAL") for J.B. and N.B., testified as follows:

The children are doing good. They have a lot of behavioral issues and other issues. They're in therapy. They're doing well.

They're in a Bellefaire program. It's just kinda tragic. You know, mother did not abandon the children and she maintained her visitation, she did some drug screens. She did some background checks.

If she did that, maybe we'd be in a different position, but as the ongoing social worker has indicated, it is true that any contact that the children say we want to call mom and then she may or may not call back.

She never initiated a call. It's kind of heartbreaking. They do love their mother, but unfortunately it's not in their best interest that their relationship be continued.

I believe it's in their best interest that permanent custody be granted, unfortunately.

{¶ 26} The court found the following on the record:

Based on the testimony and evidence presented with respect to mom * * * the Court is going to — and the report of Mr. Ellison — find that the Agency has met their burden of clear and convincing evidence and will grant the Motion for Permanent Custody.

I find that it's in their best interest * * * and prepare a journal entry reflecting what's transpired today.

## III. GAL Report

{¶ 27} The GAL's final report was filed on June 9, 2022, and the pertinent parts follow:

I visited and interviewed [J.B. and N.B.] at their foster home. The child(ren)'s needs are being met. The home and interactions were healthy and appropriate. At the beginning of the case, [J.B. and N.B.] both arrived with old marks and scars. [J.B.] had the bruises indicated in the complaint. The children indicated to foster mother physical

abuse by mother and sisters. [J.B.] has been tested and has been diagnosed with ADHD [and] cognitive and developmental delays * * *. [J.B. and N.B.] both have PTSD, are in 3rd grade with IEPs and did not know numbers (1,2,3) or ABCs when originally placed. * * * [J.B. and N.B.] receive summer camp and counseling through Bellefaire. Bellefaire therapist * * * indicates good progress. [J.B. and N.B.] receive behavioral therapy through Ohio Mentor for behavioral issues and bed wetting. * * *

[M]other, boyfriend, and boyfriend's 18 year old daughter have not complied with the court's order for finger prints and drug tests. Mother also acknowledged not visiting the children and indicated that she was moving. Recently, mother has not returned GAL's attempts to contact her for a home visit or case plan compliance.

{¶ 28} The GAL concluded that Mother has not "substantially complied with court orders [or] case plan services, or show[n] that [she] may have benefitted from any case plan services * * *." In considering the best interest of the children, the GAL recommended that permanent custody of J.B. and N.B. be granted to CCDCFS.

## IV. Court's Journal Entry

{¶ 29} The court found that Mother was "duly advised on the [June 14, 2022 custody] hearing on April 29, 2022, by mail, [but] was not present."

{¶ 30} In granting permanent custody of J.B. and N.B. to CCDCFS, the court found that the children have been in custody since November 27, 2018, which is 12 or more months of a consecutive 22-month period. The court further found that the children have been abandoned, that mother has "failed continuously and repeatedly to substantially remedy the conditions causing the child[ren] to be placed outside the child[ren]'s home," and that "Mother has a chronic mental illness that is so severe that it makes [her] unable to provide an adequate, permanent home for the child[ren] at the present time and, as anticipated, within one * * * year after the

Court holds the hearing in this matter." The court found that Mother has neglected the children by failing "to regularly visit, communicate, or support" them and "is unwilling to provide food, clothing, shelter, and other basic necessities for the child[ren] as evidenced by her unwillingness to successfully complete a case plan so she can provide care for the child[ren]."

## V. Law and Analysis

{¶ 31} We address Mother's assignments of error out of order for ease of discussion.

### A. Motion for Continuance

{¶ 32} In Mother's second assignment of error, she argues that the "court erred and abused its discretion by not granting the request by Mother's counsel for a continuance."

{¶ 33} Juv.R. 23 governs continuances in juvenile court, and it states that "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties." Furthermore, Cuyahoga County Common Pleas Court, Juvenile Division, Loc.R. 35(C) states as follows:

> No case will be continued on the day of trial or hearing except for good cause shown, which cause was not known to the party or counsel prior to the date of trial or hearing, and provided that the party and/or counsel have used diligence to be ready for trial and have notified or made diligent efforts to notify the opposing party or counsel as soon as he/she became aware of the necessity to request a postponement. This rule may not be waived by consent of counsel.

{¶ 34} "The grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse

the denial of a continuance unless there has been an abuse of discretion." *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981). Factors that courts consider when ruling on motions for continuances include the following:

> [T]he length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*Id.* at 67-68. Information will not always be available about each of these factors, and courts are not required "to assign particular weight to any one factor." *Musto v. Lorain Cty. Bd. of Revision*, 148 Ohio St.3d 456, 2016-Ohio-8058, 71 N.E.3d 279, ¶ 23.

{¶ 35} In the case at hand, Mother's attorney asked for a continuance at the hearing on CCDCFS's motion for permanent custody. She did not request a specific length of time for the continuance. Multiple continuances had been granted previously in this case, with the court noting that "[t]his is time number 18 with respect to this case * * *." Mother's counsel requested the continuance for a legitimate reason, i.e., Mother did not appear at the hearing. Mother's attorney noted that she and Mother "have been playing phone tag for the last five months." Additionally, the court stated that Mother had been "notified" about the hearing.

{¶ 36} Upon review, we find that the court acted within its discretion by denying Mother's attorney's request for a continuance. J.B. and N.B. were removed from Mother's home in November 2018, and the dispositional hearing on CCDCFS's

motion for permanent custody was held approximately three and one-half years later, in June 2022. *See In re K.R.,* 8th Dist. Cuyahoga No. 111750, 2023-Ohio-466, ¶ 35 (finding no abuse of discretion by denying a continuance, after "the case had been on the court's docket for almost two years, [because] [p]roceeding with the scheduled trial date was in K.R.'s best interest and supported her need for stability and permanency").

{¶ 37} Furthermore, under the local rule, "[n]o case will be continued on the day of trial or hearing except for good cause shown." Mother offered no reason for her absence on the day of the hearing in juvenile court, and she offers no explanation on appeal. *See In re A.W.,* 8th Dist. Cuyahoga No. 109239, 2020-Ohio-3373, ¶ 31 (finding no abuse of discretion in denying a continuance when mother "failed to show up for the permanent custody hearing without communicating with the court or her counsel regarding the circumstances of her absence").

{¶ 38} Accordingly, Mother's second assignment of error is overruled.

**B. Termination of Parental Rights**

{¶ 39} In Mother's first assignment of error, she argues that "the trial court abused its discretion in awarding permanent custody, because the state did not present sufficient, clear and convincing evidence necessary to justify termination of parental rights."

**1. Standard of Review — Permanent Custody**

{¶ 40} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is

supported by clear and convincing evidence." *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24. Pursuant to R.C. 2151.414(B)(1), "the court may grant permanent custody of a child to a movant if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency" and that any of the R.C. 2151.414(B) factors apply.

{¶ 41} "Courts apply a two-pronged test when ruling on permanent custody motions." *In re De.D.*, 8th Dist. Cuyahoga No. 108760, 2020-Ohio-906, ¶ 16. "To grant the motion, courts first must find that any of the factors in R.C. 2151.414(B)(1)(a)-(e) apply. Second, courts must determine that terminating parental rights and granting permanent custody to CCDCFS is in the best interest of the child or children using the factors in R.C. 2151.414(D)." *Id.*

### 2. R.C. 2151.414(B)(1) Factors

{¶ 42} In its June 15, 2022 journal entry granting permanent custody of J.B. and N.B. to CCDCFS, the court found that two R.C. 2151.414(B)(1) factors applied. First, the court found that, pursuant to R.C. 2151.414(B)(1)(b), the children were abandoned. Second, the court found that, pursuant to R.C. 2151.414(B)(1)(d), the children have been in temporary custody of CCDCFS for 12 or more months of a consecutive 22-month period.

### 3. R.C. 2151.414(D)(1) Best-Interest Factors

{¶ 43} Also in the June 15, 2022 journal entry, the court considered the best-interest factors under R.C. 2151.414(D)(1)(a)-(e), including: the relationship of the children with their family and foster caregivers; the wishes of the children via the

GAL; the custodial history of the children; the need for a legally secure placement; and that the children were abandoned. *See In re A.M.,* 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 31 ("R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires.").

### 4. Additional Findings

{¶ 44} Furthermore, the court concluded that the children "cannot be placed with mother * * * within a reasonable time or should not be placed with the mother" and made the following additional findings under R.C. 2151.414(E).

{¶ 45} Under subsection (E)(1), the court found that Mother has "failed continuously and repeatedly to substantially remedy the conditions causing the [children] to be placed outside the [children's] home."

{¶ 46} Under subsection (E)(2), the court found that "Mother has a chronic mental illness that is so severe that it makes the parent unable to provide an adequate, permanent home for the child[ren] at the present time and, as anticipated, within one * * * year * * *."

{¶ 47} Under subsection (E)(4), the court found that "Mother has demonstrated a lack of commitment towards the child[ren] by failing to regularly support, visit, or communicate with the child[ren] * * * [and] has shown an unwillingness to provide an adequate, permanent home for the child[ren]."

{¶ 48} Under subsection (E)(10), the court found that Mother has abandoned the children.

**{¶ 49}** Under subsection (E)(14), the court found that "Mother is unwilling to provide food, clothing, shelter, and other basic necessities for the child[ren] as evidenced by her unwillingness to successfully complete a case plan so she can provide care for the child[ren]."

**5. Clear and Convincing Evidence Supports the Trial Court's Findings Under R.C. 2151.414(B)(1) and (E)**

**{¶ 50}** Upon review, we find that clear and convincing evidence supports the trial court's findings under R.C. 2151.414(B)(1) and (E).

**{¶ 51}** Pursuant to R.C. 2151.011, "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." Grucza testified at the June 2022 hearing that Mother has had no communication with CCDCFS since May 2021, Mother is "not visiting" the children, and Mother has spoken to the children on the phone "five times" since May 2021, with all of the phone calls initiated by the children. Although the GAL stated at the hearing that Mother has not abandoned the children, he noted that Mother acknowledged "not visiting" the children. Furthermore, the GAL stated that he has had no "recent" contact or communication with Mother.

**{¶ 52}** Both Grucza and the GAL have been unable to assess whether Mother's current living conditions would be appropriate for her having custody of J.B. and N.B. Despite Mother's efforts to comply with her case plan services early in this case, she failed to comply with the June 2021 order for a drug test for herself and drug tests and background screenings for adult members of her household.

Grucza testified that she and CCDCFS engaged in "diligent efforts * * * to assist" Mother with these services, including reaching out to her and scheduling appointments.

{¶ 53} Upon review, we find that there is clear and convincing evidence in the record that Mother has abandoned the children, failed to remedy the conditions causing the children's removal, demonstrated a lack of commitment to the children, and shown an unwillingness to provide for the children.

{¶ 54} Additionally, we find clear and convincing evidence in the record that the children have been in custody for more than 12 months of a consecutive 22-month period. The hearing took place in June 2022, and the children have been in CCDCFS's custody since November 2018.

{¶ 55} As to the court's finding that Mother's "chronic mental illness" impacts her ability to provide for the children, we find that Mother stipulated to this allegation in the amended complaint.

6. **Clear and Convincing Evidence Supports the Trial Court's Findings Under R.C. 2151.414(D) that Permanent Custody to CCDCFS is in the Children's Best Interest**

{¶ 56} Grucza and the GAL testified that the children were doing well in their foster home placement. All of the evidence in the record shows that, although the children love Mother, their relationship has become strained because of Mother's unwillingness to cooperate with CCDCFS and provide for the children. The custodial history shows that the children have been in foster care from November 2018 through the June 2022 hearing. Mother was allowed overnight or "extended"

visits starting on October 7, 2020, and by November 3, 2020, these visits were suspended because of allegations of drug use. Although the allegations were ultimately unsubstantiated, Mother failed to comply with subsequent drug screens.

{¶ 57} The Ohio Supreme Court has held that, regarding the best interest of the child portion of a permanent custody case, "[t]here is not one element that is given greater weight than the others pursuant to" R.C. 2151.414(D). *In re Shaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. "R.C. 2151.414 requires the court to find the best option for the child once a determination has been made pursuant to" R.C. 2151.414(B)(1)(a)-(e). *Id*. at ¶ 64.

{¶ 58} In the case at hand, the court determined that the children were abandoned and had been in CCDCFS's custody for 12 or more months of a consecutive 22-month period. Upon review, and given these determinations, we find that the court properly considered the relevant statutory factors and acted within its discretion when it found that permanent custody to CCDCFS was in the best interests of the children.

{¶ 59} Accordingly, we find that clear and convincing evidence in the record supports the trial court's decision to terminate Mother's parental rights and grant custody of J.B. and N.B. to CCDCFS. Mother's first assignment of error is overruled.

{¶ 60} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J., and
EILEEN T. GALLAGHER, J., CONCUR